IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| KEITH WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-0306-CV-W-NKL-SSA |
| ) | |
| JO ANNE B. BARNHART, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

ORDER

Pending before the Court is Plaintiff Keith Williams's ("Williams") Motion for Summary Judgment [Doc. # 10]. Williams seeks judicial review of the Commissioner's denial of his requests for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Because the Court finds that the Administrative Law Judge's decision is supported by substantial evidence in the record as a whole, the Court affirms the ALJ's decision.

---

[1] Upon review of the record and the law, the Court finds the Defendant's position persuasive. Portions of the Defendant's brief are adopted without quotation designated.

1

## I. Background

### A. Medical Records

Williams suffered a neck injury on December 14, 2000, the alleged date of disability onset, resulting in pain to his left extremity. On March 2, 2001, Williams underwent decompression of C2, C3 and C4 and bone fusion and plating. He experienced some improvement following surgery but later developed more pain in his left neck and upper extremity. (Tr. 20.) An MRI on August 7, 2001, showed

> a degenerative disc bulging [at C4-C5] which results in some thecal sac effacement but not definitive stenosis. There are also some uncontrovertebral degenerative joint changes which may result in some encroachment upon the left neural foraminal. At C5-C6 there is also degenerative disc bulging with a small central disc herniation which extends inferiorly. This results in mild central canal stenosis and also impinges upon the central and right spinal cord. At C6-C7, there is a degenerative disc bulging as well as some facet joint uncontrovertebral degenerative changes with posterior vertebral spurring. These result in at least mild central stenosis with bilateral neural foraminal stenosis as well.

(Tr. 170.)

A radiology report, dated April 24, 2002, indicated loss of normal cervical lordosis with normal alignment of the cervical vertebra. Mild to moderate degenerative changes were noted involving the entire cervical spine with sclerosis of the vertebral body endplates; degenerative spurring and mild osteophytosis noted. This report also indicated a decrease in C6-C7 intervertebral disk space. At this time, there was no evidence of prevertebral soft tissue swelling. Minimal narrowing of the C6-C7 and C7-T1 neural foraminal were noted. (Tr. 211.)

Dr. Dan Hancock of Baptist Medical Center noted his evaluation of Williams by letter dated May 14, 2002. Dr. Hancock had seen Williams in consultation at the Pain Management Center. He indicated that he had completed a series of cervical epidural steroid injections and reports that he has enjoyed a 50% reduction in the intensity of his left-sided neck and left upper extremity pain. He further indicated that Williams continues to have some numbness and tingling and aching discomfort in his left upper extremity and left hand as well as an occasional "catching" of his neck with movement.

Notes from the VA Medical Center show that Williams also saw doctors for knee pain. Treatment records from July 2001, show that Williams did not walk with a limp, and there was no right knee protection observed. (Tr. 255.) His right knee had full passive and active range of motion, patella tracking was good, and there was no joint effusion. (Tr. 253.) In October 2001, Williams had full range of motion in his right knee (Tr. 246.) Likewise, in January 2002, Williams' knees showed no effusion, he had full range of motion, his knees were stable to stress maneuvers, and his coordination was normal. (Tr. 230.)

Upon examination in February 2002, Dr. James Armstrong, orthopedic staff physician at the VA, specifically recorded that:

> It should be noted that the patient used both upper extremities to pull up his long pants and tight long johns and to pull them back down again. There was no protection of the left upper extremity. There was no protection of the cervical spine getting on and off the examining table, out of a reclining position, or turning the head and neck.

(Tr. 226). On February 5, 2002, Dr. Stephanie Thompson, Assistant Professor at the VA Hospital, also noted that Williams could heel and toe walk "well," and he had no limp but he did walk with a slow gait. (Tr. 227.) However, when he returned to the waiting room, "that slow gait went away." (Tr. 227.) Williams had no muscle atrophy, his range of motion was within normal limits in all major joints, and his strength was normal in March 2002. (Tr. 222.)

Consultative examination by Dr. Ronald D. Holzschuh, Ph.D, dated July 30, 2002, indicated that Williams seemed intellectually impaired. Williams had indicated that Brazil was on the "west continent," "Roosevelt or Grant" was President during the Civil War, and France was the capital of Italy. He was only able to repeat four digits forward and three backward. During the examination, Williams reported that an ordinary day for him included projects around the house, watching television, talking on the phone, and doing some "Kung Fu." He said he was a black belt in martial arts. (Tr. 313.) Dr. Holzschuh's summary revealed a 50 year old man who claims to have experienced a serious injury to his neck and multiple consequential pains in his upper body and arms. Williams also gave the impression that he was heavily sedated. The doctor noted that his response to inquiries were frequently derailed, usually in the direction of discussing conflicts with his wife. Dr. Holzschuh also observed that his attention and concentration were very poor; social interaction was very distant but appropriately interactive; insight seems poor but judgment intact. His diagnostic impression was that of depressed mood; disorder in reaction to medical trauma; chronic pain; and marital conflict. (Tr. 313-14.)

4

VA records dated June 10, 2002, indicate Williams again saw an orthopaedist for his knees. The progress notes indicate that his knee and cervical condition were exacerbated by physical activity and these conditions made Williams unemployable. (Tr. 199-200). A summary of Nerve Conduction Studies from the VA Medical Center, dated June 20, 2002, indicate bilateral median and ulnar motor studies showed borderline normal distal latencies. Bilateral median, bilateral ulnar and right sural sensory studies showed mild prolonged distal latencies and mildly decreased or low normal amplitudes. EMG of the left upper extremity indicated there was mildly increased polyphasia seen in the deltoid. Impressions evidenced a primarily demyelinating peripheral neuropathy involving mainly the sensory fibers. (Tr. 95.)

On October 22, 2002, Dr. Allen J. Parmet performed a consultative exam. According to Dr. Parmet, when he returned after a 10 minute break for the physical examination, Williams was sleeping on the examining table. After the interview, he was again sleeping on the table. His motions were slow and guarded at all times. Dr. Parmet noted that Williams had full upper extremity strength and full shoulder, elbow, and wrist ranges of motion. (Tr. 321, 323.) His muscles were well developed and without evidence of atrophy, his right knee was stable, and his hip, knee, and ankle motion was normal. (Tr. 321, 324.) Williams was diagnosed with 1) chronic neck pain, some findings of early peripheral neuropathy from diabetes; 2) diabetes, mellitus, type 2: some findings compatible with early peripheral neuropathy; 3) degenerative joint disease, right knee and 4) depression, controlled. (Tr. 320-21.)

VA records show that Williams's passive range of motion was intact during examination in March 2003.  (Tr. 336.)  In May 2003, Williams had no muscle atrophy, his range of motion was within normal limits for all major joints, and his strength was normal.  (Tr. 393.)  He was independent with all activities of daily living.  (Tr. 393.)  Subsequently, in July 2003, Williams reported that he was doing well.  (Tr. 488.)  He "volunteer[ed] for Kung Fu, and spent his time socializing with friends and family."  (Tr. 488.)  His depression was considered to be in remission.  (Tr. 489.)  Williams's right knee showed only mild trace effusion, mild crepitus, and mild joint line tenderness during an October 2003 examination.  (Tr. 453.)  In February 2004, Williams stated that he tried to live an active life, including weight training and cardiovascular activities.  (Tr. 509.)  Thereafter, in April 2004, Williams had no difficulty walking during examination (Tr. 502.)

### B. Hearing Testimony

Williams was represented by counsel at an administrative hearing before ALJ Berry on July 20, 2004.  After Williams testified, the ALJ took testimony from vocational expert, Marianne Lumpe ("Lumpe").

Williams testified that he was 52 years old, born on November 20, 1951.  (Tr. 42.)  He completed his GED and had gone to junior college for a year and a half.  (Tr. 49.)  He further testified that he joined the Ironworkers Union and started an apprenticeship program, but never completed it.  (Tr. 50.)   He testified that he last held a position in December 2000 at Bays and Wilcock Construction Company as an iron worker. (Tr. 42.)

6

Case 4:05-cv-00306-NKL   Document 14   Filed 03/23/06   Page 6 of 17

He testified that he had an on-the-job injury wherein he was working on a crossbeam and some workers above him dropped something which struck him in the neck.

Williams testified that the injury caused him pain in his upper neck and left side. The pain also runs down his left arm to his left hand, his fingers and thumb. (Tr. 43.) Williams testified that his right knee was bone-on-bone, and his left leg had arthritis in it from carrying the weight of his right leg. (Tr. 43.) He further testified that he had limitations in his neck in that looking left or right, or looking up for long periods of time causes pain, and that he has to come to a forward position. (Tr. 43.) He testified that he had trouble with the use of his hands and arms in that his left hand does not feel objects. (Tr. 43.)

Williams testified that he has a home computer but he is unable to sit for long periods of time without pain in his hand and neck. (Tr. 44.) At this point in his testimony, Williams then stood up due to the pain in his arm and neck. (Tr. 44.) He further testified that he could not sit in certain chairs for long periods of time. He then said that his wife bought him a "recliner-like chair" that he spends maybe six hours in, off and on, all day, watching television. (Tr. 44-45.)

Williams testified that he lives with his wife and has no children. His wife works outside of the home. From time to time he vacuums the house and cuts the grass. He stated that he mows the grass with a riding mower a section at a time and takes a break until he is finished. (Tr. 45.) Although he has trouble driving a car, he indicated that he drives short distances.

7

Williams testified that he has trouble extending or reaching overhead with his arms in that when he reaches with his left arm, it causes him pain in the lower part of his neck. Since he is left-handed, he is always reaching with his left hand and causing himself pain. (Tr. 46.) Williams testified that he has diabetes and his doctors have placed him on a special diet which he follows. (Tr. 46.). Williams testified that there was not any treatment or medication that he refuses. (Tr. 48.) He further testified that his prescribed medications make him sleepy all the time. (Tr. 47.) He also testified that he goes to bed about 2:00 or 3:00 a.m, because the pain prevents him from sleeping. (Tr. 47.)

Williams testified that he does not engage in any social activities or organizations outside of his home. (Tr. 47.) Williams further testified that he was involved in martial arts, but that he gave it up "last year." He also indicated that he lifted weights to get into shape, but quit doing so in January 2004. (Tr. 52.) He further testified that he does not play baseball or softball because he cannot throw or catch with his left arm anymore. (Tr. 48.) He indicated that he takes Oxycodone and Trazodone for pain. Although these medications were somewhat helpful, he stated that the dosage is not enough. (Tr. 50.) He further testified that the pain medications made him tired and affected his memory. (Tr. 51.)

Williams testified that he could stand about 2½ hours in an 8 hour day, walk maybe 1½ hours in an 8 hour day, lift and carry about 25 pounds in an 8 hour day, and sit for 2 hours in an 8 hour day. (Tr. 52-53.) When asked if he could pick up a toothbrush, hairbrush, comb, set of keys and some loose change, or sunglasses, Williams testified that

8

he could get the "toothbrush - - the change, probably not as much as I would pick up any solid object." (Tr. 53.)  When asked by the ALJ if he would be able to use each item for it's intended purpose, Williams testified, "A toothbrush, yes.  The brush, not really, because I would have to use it over my head a lot.  Something else that's there - - that's about all I can remember, sir. Just - - [t]hat's about all I can remember, sir."  (Tr. 54.)

Following Williams's testimony, vocational expert Marianne Lumpe testified.  Lumpe described Williams's prior job history which included a steelworker/ironworker, heavy and skilled; a mental health technician, medium and semi-skilled; and manager of a food production line, light and skilled.  (Tr. 55.)  Concerning Williams's transferable skills, Lumpe further testified that Williams could transfer skills in his capacity as a steelworker, and manager.  (Tr. 56.)  The ALJ then posed a hypothetical 52 year old man with a GED,  some college course credits, and past relevant work experience, with a combination of severe impairments giving him a residual functional capacity to lift and carry 50 pounds occasionally, 25 pounds frequently.  The individual retains the ability to stand, walk and sit six to eight hours.  This individual retains the ability to occasionally climb, kneel, and crouch.  This individual must avoid exposure to unprotected heights and dangerous, moving machinery.  Given these limitations and these alone, can such an individual perform any of the claimant's past work?"  (Tr. 56-57.)  Lumpe testified that the person "could perform the job of a mental health technician, which is - - and also of the production of a managerial position.  The setting might be a little different, given your

9

restriction on - - you know - - dangerous equipment.  But that would not always - - there would still be jobs in those skills."  (Tr. 58.)

The ALJ then posed the second hypothetical with the same vocational parameters and residual functional capacity as the first but this person would need to recline approximately six hours per workday.  This individual would have difficulty reaching overhead with the dominant, left upper extremity.  Furthermore this individual would experience periods of tiredness, or perhaps fatigue, for a better term.  The vocational expert testified that such an individual could not perform any of Williams's past work or any other work in the national economy.  (Tr. 58).

## II.     Discussion

### A.     Standard of Review

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  *See Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion.  *See Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as substantial evidence in the record supports the Commissioner's decision, the court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because the court would have decided the case differently.  *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).  If, after reviewing the record, the Court finds that it is possible to draw

10

two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citations omitted). The Eighth Circuit has noted that "We defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

### B. The ALJ Properly Considered the Combined Effects of Williams's Impairments

Williams argues that the ALJ "[did] not indicate anywhere that he considered the combined effects of [Williams's] multiple impairments on his ability to perform his past relevant work." Pl. Brief, at 17. But he did consider each impairment, and to require a more elaborate articulation of the ALJ's thought processes would not be reasonable. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992). Review of the records shows that the ALJ discussed Williams's neck, back, knees, right shoulder, and depression. (Tr. 20-25.) Thereafter, upon evaluation of all of the evidence, the ALJ set forth an individualized RFC finding which properly accounted for all of Williams's credible limitations. (Tr. 25-26.) It is fair to conclude from this record that the ALJ took all of Williams's credible limitations into account when he found that Williams was not disabled.

### C. The ALJ's Residual Functional Capacity Finding Properly Accounted for All of Williams's Credible Limitations

Williams also argues that the ALJ found that he had "arthritis, knee pain, back pain, and mental impairments," yet failed to account for those limitations in his RFC

11

finding. Pl. Brief at 17. This argument misstates the record. The ALJ did not find that Williams had "arthritis, knee pain, back pain, and mental impairments" as Williams alleges. The portion of the ALJ's decision cited to by Williams states that "[Williams] is alleging disability since December 14, 2000 due to arthritis, knee pain, back pain, and mental impairments." (Tr. 18.) The ALJ did find that Williams's degenerative disc disease was severe as defined in the regulations. (Tr. 19.) But upon evaluating the record as a whole, the ALJ found that Williams's complaints were not credible. (Tr. 27.) He then determined that Williams had the RFC to lift and carry 25 pounds frequently and 50 pounds occasionally; sit, stand, or walk six hours in an eight-hour workday; and occasionally climb, kneel, and crawl. (Tr. 25.) In addition, he must avoid unprotected heights and dangerous moving machinery. (Tr. 25.) There is substantial evidence in the record to supports the ALJ's finding.

  The objective medical evidence of record fails to support a finding of disability. Although a claimant's subjective complaints cannot be disregarded solely because they are not fully supported by objective medical evidence, it is well established that a sufficient basis exists to discount subjective complaints of pain where the complaints are inconsistent with the record as a whole. *Wilson v. Chater*, 76 F.3d 238, 241 (8th Cir. 1996). The record in this case shows that in July 2001, Williams did not walk with a limp and there was no right knee protection observed. (Tr. 255.) His right knee had full passive and active range of motion, patella tracking was good, and there was no joint effusion. (Tr. 253.) In October 2001, Williams had full range of motion in his right knee.

(Tr. 246.)  In January 2002, Williams's knees showed no effusion, he had full range of motion, his knees were stable to stress maneuvers, and his coordination was normal.  (Tr. 230.)  Williams had no muscle atrophy, his range of motion was within normal limits in all major joints, and his strength was normal in March 2002.  (Tr. 222.)  During evaluation in July 2002, Williams's locomotion was described as "ordinary."  (Tr. 313.)  In October 2002, Williams had full upper extremity strength and full shoulder, elbow, and wrist ranges of motion.  (Tr. 321, 323.)  His muscles were well developed and without evidence of atrophy, his right knee was stable, and his hip, knee, and ankle motion was normal.  (Tr. 321, 324.)  Williams's passive range of motion was intact during examination in March 2003.  (Tr. 336.)  Medical evidence from May 2003, also indicates that Williams had no muscle atrophy, his range of motion was within normal limits for all major joints, and his strength was normal.  (Tr. 393.)  Williams's right knee showed only mild trace effusion, mild crepitus, and mild joint line tenderness during an October 2003 examination.  (Tr. 453.)  Thereafter, in April 2004, Williams had no difficulty walking during examination.  (Tr. 502.)

The record also shows that treatment provided pain symptom control.  (Tr. 199, 208-09, 215, 221, 246, 336, 355, 368, 375, 378, 412, 444, 471.)  Also, in February 2002, Williams was described as appearing "comfortable while sitting."  (Tr. 224.)  The record also indicates that Williams did not experience significant medication side effects.  (Tr. 225, 241, 245, 339, 380, 505.)

13

Williams's activities are also inconsistent with a finding of disability. The record shows that in October 2001, Williams was continuing with his martial arts, and he still led a very fairly active life. (Tr. 246-47.) During examination in July 2002, Williams reported that he continued doing some Kung Fu. (Tr. 313.) In May 2003, Williams was reported to be independent with all activities of daily living. (Tr. 393, 403.) In July 2003, Williams reported that he "volunteer[ed]" for Kung Fu. (Tr. 488.) In February 2004, Williams reported trying to live an active life, including weight training and cardiovascular activities. (Tr. 509.) These activities are substantial evidence in support of the Commissioner's decision that Williams is not disabled. *Pena v. Chater,* 76 F.3d 906, 908 (8th Cir. 1996); *McGinnis v. Chater*, 74 F.3d 873, 875 (8th Cir. 1996).

Furthermore, the record indicates that Dr. James Armstrong, orthopedic staff physician at the VA Hospital, stated that, "It should be noted that the patient used both upper extremities to pull up his long pants and tight long johns and to pull them back down again. There was no protection of the left upper extremity. There was no protection of the cervical spine getting on and off the examining table, out of a reclining position, or tuning the head and neck." (Tr. 226.)

Dr. Stephanie Thompson, Assistant Professor at the VA Hospital, also noted that, on February 5, 2002, Williams could heel and toe walk "well," and he had no limp but he did walk with a slow gait. (Tr. 227.) However, when he returned to the waiting room, "that slow gait went away." (Tr. 227.)

14

The Commissioner may discount subjective complaints where there are inconsistencies in the evidence as a whole. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). Because the ALJ articulated the inconsistencies on which he relied in discrediting Williams's testimony regarding his subjective complaints, and because the credibility finding is supported by substantial evidence on the record as a whole, the ALJ's credibility finding must be affirmed. *Pena*, 76 F.3d at 908.

### D. The ALJ's Residual Functional Capacity Finding Properly Accounted for All of William's Credible Limitations

Williams also argues that the ALJ failed to set forth functional limitations due to a mental impairment and failed to inquire about the mental demands of his past relevant work. Pl. Brief at 18-20. But in assessing Williams's mental condition, the ALJ determined that his depressive disorder was not severe. (Tr. 19.) The ALJ was not required to set forth functional restrictions due to a nonsevere impairment. By definition, a nonsevere impairment does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a) (2005). Thus, there are no functional limitations which must be included in the claimant's RFC. Likewise, no discussion of the mental demands of Williams's past relevant work was needed.

In this case, the ALJ properly noted that medication produced positive results, there was no history of psychiatric inpatient hospitalization, no evidence of decompensation, and no limitation on his ability to engage in daily activities. (Tr. 19, 23, 393, 403, 446, 449, 488, 509). In fact, the record indicates that Williams's depression was controlled. (Tr. 23, 322, 489.) The record shows that Williams experienced

15

depression due to his marital situation. (Tr. 202-07.) Upon obtaining a divorce in October 2002, Williams's depression was found to be in partial remission. (Tr. 365.) In March 2003, a mental status examination was essentially unremarkable. (Tr. 339.) Thereafter, in July 2003, Williams stated that he was doing well. (Tr. 488.). His depression was considered to be in remission. (Tr. 489.) In January, February, and March 2004, Williams's depression was described as only mild and no significant limitations were noted. (Tr. 437-38, 506, 508.). In February 2004, Williams felt he was doing well, and his global assessment of functioning ("GAF") score was estimated at 65. (Tr. 505, 508.) The DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, at 32 (4th ed. 1994) states that GAF scores from 61 to 70 indicate only mild symptoms.

At the administrative hearing, the ALJ asked a vocational expert to assume an individual of Williams's age, education, past work experience, and RFC. (Tr. 56-57.) In response, the vocational expert testified that the individual could perform Williams's past relevant work as a mental health technician or production manager. (Tr. 57.) If an individual can perform his past relevant work either as he performed it or as the work is performed in the national economy, he is not disabled. *Gaddis v. Chater,* 76 F.3d 893, 896 (8th Cir. 1996); *Jackson v. Sullivan*, 984 F.2d 967 (8th Cir. 1993).

### III. Conclusion

A review of the record as a whole reveals that the ALJ's decision is supported by substantial evidence. Accordingly, it is hereby

16

ORDERED that Williams's Motion for Summary Judgment [Doc. # 10] is DENIED.  The decision of the Commissioner is AFFIRMED.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: March 23, 2006
Jefferson City, Missouri